### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

**APRIL RANDALL,**

     **Plaintiff,**

                                **Case No.:**

**vs.**

**NORTH FLORIDA REGIONAL
MEDICAL CENTER, INC.**

     **Defendant.**

_____

### COMPLAINT

### DEMAND FOR JURY TRIAL

**COMES NOW**, the Plaintiff, April Randall, by and through her undersigned counsel, brings this lawsuit seeking declaratory relief, injunctive relief, and monetary damages against Defendant, North Florida Regional Medical Center, Inc. ("NFRMC") for violations of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and Section 1557 of the Patient Protection and Affordable Care Act ("Affordable Care Act"). Defendant failed to provide effective communication and meaningful access for the deaf Plaintiff when she sought medical treatment fourteen (14) times from 2017 to present, when seeking treatment for herself and her minor daughters. Defendant intentionally denied Plaintiff full and equal enjoyment of Defendant's services,

1

facilities, and privileges. Defendant failed to provide effective auxiliary aids. Defendant failed to make reasonable modifications in policies, practices or procedures, and failed to take such steps as are necessary to ensure the Plaintiff was not excluded, denied services, or otherwise treated differently because of her disabilities.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the actions pursuant to 28 U.S.C. § 1331, 1343.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1)-(b)(2) because 1.) The Defendant is located in this district, and 2.) A substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

## PARTIES

## PLAINTIFF

3.      Plaintiff, APRIL RANDALL ("Ms. Randall"), is and was, at all times material hereto, a resident of Alachua County, Florida. Ms. Randall is deaf, and relies upon American Sign Language ("ASL") to communicate effectively.

## DEFENDANT

4.      Defendant, NORTH FLORIDA REGIONAL MEDICAL CENTER, INC. ("NFRMC") is located in Gainesville, Florida, and is a place of public

accommodation pursuant to 42 U.S.C. §12181 (7)(F), and is subject to the mandates of Title III of the ADA and its implementing regulations.

5.     NFRMC is a recipient of federal financial assistance and is, therefore, subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations.

6.     Defendant is principally engaged in the business of providing health care and are, therefore, subject to Section 1557 of the Patient Protection and Affordable Care Act, 29 U.S.C. § 705(20) and 42 U.S.C. § 12102. *See* 42 U.S.C. § 18116; 45 C.F.R. § 92.4, and its implementing regulations.

## FACTUAL ALLEGATIONS

7.     Ms. Randall became deaf when she was one(1) year old and relies upon American Sign Language ("ASL") to communicate effectively in a bi-directional manner. Ms. Randall cannot speak "clearly" and, therefore does not communicate by speaking because it is not effective.

8.     Ms. Randall cannot lip-read well enough to communicate without an interpreter. The presence of face masks makes any lip-reading impossible. Even when using a hearing aid, Ms. Randall cannot hear enough to understand what is being said.

9.     When Ms. Randall receives medical treatment for herself, or her minor daughters, she requests an ASL interpreter. In order to engage in an

interactive exchange of medical information, Ms. Randall requires a qualified ASL interpreter.

10.     Ms. Randall is a single mother to two minor daughters, A.W. who is now six (6) years old, and A.R.W. who is four (4) years old.

11.     When Ms. Randall receives treatment at NFRMC she must exchange her medical information with a broad range of staff.

12.     Normally, Ms. Randall would check in for treatment with one employee, then undergo some form of triage with different staff, and then be sent to a waiting area. Once she is called back to an examining room, she interacts with different medical staff, to include doctors, nurses, nurse practitioners, etc. If she is sent for x-rays or CT scans, she must interact with other staff members about her medical care. Upon receipt of the result of such tests, the medical staff must explain those to Ms. Randall and respond to her questions. Then when safe to be discharged, NFRMC must explain the discharge instructions, which can include a recommendation for her to see other medical providers for follow up treatment, the proper use of medication and a summary of what treatment she received.

13.     NFRMC provides interpreting services through Video Remote Interpreting (VRI), which is a service allowing the sign language interpreter to appear remotely through a computer. The VRI equipment used at NFRMC from

2017 to present consisted either of a laptop or iPad on some type of cart or rolling pole.

14.    When NFRMC uses the VRI, and when it works, the device is shut off after a medical provider speaks to Ms. Randall.  This requires the next person, who shall engage in an exchange of her medical information, to log back onto the device and get it started all over again. This consistently does not happen.

15.    When Ms. Randall must undergo scans or x-rays, the VRI device is never provided to communicate with those staff members. This prevents Ms. Randall from engaging in an exchange of her medical information, and to ask questions about the procedures, or express any fears she has, and to seek comfort.

16.    Ms. Randall has been using the services of NFRMC since approximately 2009, and has been continually denied effective communication from the hospital. Prior to the first visit in her Complaint, she had been forced to use the non-operational VRI, and as a result has been requesting onsite ASL interpreters.

17.    <u>First Visit to NFRMC</u>: On April 15, 2017, Ms. Randall went to the Emergency Room for a headache and vaginal pain. These are two ongoing medical issues for Ms. Randall stemming from a botched tubal ligation.

18.     NFRMC staff documented she was deaf in her medical records. Upon her arrival, and having experienced the problems with VRI in the past, Ms. Randall requested an onsite ASL interpreter.

19.     NFRMC attempted to provide an interpreter through VRI. The VRI did not work, and the image of the interpreter continued to freeze, and black out. The staff could see the device did not work. NFRMC then abandoned the VRI device, because it did not work.

20.     Instead of providing *primary consideration* to her request for an ASL interpreter Ms. Randall was forced to attempt to write messages back and forth with the doctor and staff.

21.     When Ms. Randall is forced to write back and forth, she will often have to look up the meaning of medical terms she is not familiar with on her cell phone. This arduous and upsetting task was a common theme for Ms. Randall when receiving medical treatment at NFRMC due to the absence of an onsite interpreter.

22.     During this approximately 4.5 hour visit, Ms. Randall underwent a CT scan of the brain and some sensitive female testing. Ms. Randall did not understand the medical treatment, nor was she able to ask questions. Ms. Randall was not provided an interpreter to explain the discharge instructions.

23.   <u>Second Visit to NFRMC</u>: On June 7, 2017, Ms. Randall went to the Emergency Room after finding a growth under her arm. She was very concerned it was cancer. She was accompanied by her mother, Ms. Jackson.

24.   Ms. Randall and her mother requested an onsite ASL interpreter. NFRMC ignored her request, and attempted to provide an interpreter through VRI.

25.   The first VRI laptop did not work. NFRMC is believed to have brought in a second VRI device, and it did not work. The image was grainy and choppy which required the interpreter to continually repeat everything. The starting and stopping of discussing medical information made it impossible for Ms. Randall to discuss her medical needs, because each time she began to sign, the VRI interpreter would freeze, and she would have to wait until the reception was better, and start over again.

26.   The staff could see the VRI device did not work, but failed to secure an onsite interpreter. They were also required to continually stop and start because the device would not work. The VRI device was eventually abandoned by NFRMC. As a result, and what was commonly employed at NFRMC, they forced Ms. Randall to communicate by writing on paper or being degraded to typing into her cell phone.

27.   Ms. Randall's mother, Ms. Jackson, cannot sign well, and cannot sign medical terms. Seeing the VRI device was not working, Ms. Jackson again

requested an onsite interpreter for her daughter, but was told NFRMC only provides VRI and if they wanted an onsite interpreter they had to pay for it themselves.

28.     During this visit Ms. Randall underwent chest x-rays and other examinations, which required communication not only with the registration desk and her treatment team, but other medical providers at NFRMC.

29.     When the medical staff left the room, Ms. Randall's mother would try to explain, in her very basic sign language, what the doctor said, but this was not effective. Ms. Randall also tried to look up medical terms which NFRMC failed to explain to her.

30.     According to the medical records, Ms. Randall was told she needed to have a biopsy. Ms. Randall did not know she needed a biopsy, because she did not understand her medical treatment or the discharge instructions, and never sought a biopsy.

31.     Third Visit to NFRMC: On January 23, 2018, Ms. Randall was having extreme abdominal pain and was taken to the Emergency Room by ambulance. Due to the ongoing issues with a prior botched tubal ligation, she was very worried something was seriously wrong.

32.     Upon arrival, Ms. Randall requested an onsite interpreter as did her deaf fiancé, Damis Fellove. NFRMC failed to provide an onsite interpreter for the

treatment. Instead, NFRMC attempted again to use VRI which was not an effective auxiliary aid. Ms. Randall told the staff she could not understand.

33.     On information and belief, at this visit Ms. Randall's fiancé pulled up the ADA law on his cell phone to show the hospital they had a right to an onsite interpreter if the VRI equipment does not work. But the hospital refused to secure an onsite interpreter for Ms. Randall or her deaf fiancé.

34.     During the visit, Ms. Randall underwent an ultrasound, blood work, and other examinations. Ms. Randall was unable to engage in an exchange of her medical information. Ms. Randall was in a great deal of pain, and was tired of continually asking for an onsite interpreter, or an effective auxiliary aid that worked.

35.     Medical staff would come into the room and keep speaking, or attempting to write and would not turn on the VRI. When the VRI was attempted it did not work, and was not provided with each exchange she had throughout the course of her treatment to include her discharge.

36.     <u>Fourth Visit to NFRMC</u>: Ms. Randall sought treatment at the Emergency Room on November 14, 2018, for pelvic and back pain. With Ms. Randall was her deaf fiancé, and her two minor children who were age four (4), and almost two (2).

37.     Although NFRMC provided VRI to Ms. Randall, it was not effective, because the screen kept freezing and pixilated. Ms. Randall and her deaf fiancé were also trying to manage the children, as they had to stop and wait for the device to work again.

38.     VRI was not used throughout her treatment to include the discharge. Ms. Randall did not understand why her ongoing abdominal pain issues could not be surgically corrected.

39.     <u>Fifth Visit to NFRMC</u>: On December 13, 2018, Ms. Randall arrived at the hospital by ambulance for abdominal pain. Ms. Randall was very worried because her abdominal pain, and other issues associated with the botched tubal ligation were becoming worse.

40.     Upon arrival, Ms. Randall requested an onsite interpreter and, again, NFRMC failed to provide an effective auxiliary aid.

41.     The VRI was not used throughout her treatment, and when it was used the VRI froze and the interpreter appeared choppy, grainy and delayed.

42.     <u>Sixth Visit to NFRMC</u>: On January 3, 2019, Ms. Randall was taken by ambulance presenting with abdominal pain and serious flu like symptoms. NFRMC noted in her medical records she was "deaf." Ms. Randall was accompanied by her deaf fiancé.

43.    Ms. Randall and her fiancé requested an interpreter, but NFRMC notes in the medical records "the electronic device for interpreting was unavailable at time of evaluation/treatment." As a result, Ms. Randall was forced to try to communicate by writing back and forth.

44.    Communicating in writing with two deaf people is not an effective way to exchange medical information. The pad of paper would need to be shown to each person, allowing them to read it, and then write back. This did not occur, and neither Ms. Randall, nor her companion could effectively communicate.

45.    Ms. Randall was very upset and emotional due to the ongoing abdominal pain, and the inability to understand why the medical professionals could not abate these symptoms.

46.    Seventh Visit to NFRMC: Ms. Randall returned to NFRMC's Emergency Room on February 1, 2019, for a headache, cough, and sore throat. Ms. Randall's two minor children were also seen for the same symptoms.

47.    At the time, A.W. was four (4) and A.R.W. was two (2). Due to the ongoing problems with the VRI, Ms. Randall requested an onsite interpreter. On information and belief neither an onsite interpreter nor the VRI was used.

48.    Ms. Randall was forced to write back and forth with the medical staff for her treatment and that of her two children. One of Ms. Randall's children had been diagnosed with ADHD, and is very rambunctious. The medical records reflect

the child was running around the room. It was not effective, or manageable to write during the treatment, and Ms. Randall told NFRMC the same.

49.    Eighth Visit to NFRMC: On February 5, 2019, Ms. Randall took her two minor children, A.W. and A.R.W., back to Emergency Room for the same symptoms of fever, coughing, and runny nose. Ms. Randall was worried because the children had not gotten better, and were now running fevers. Plaintiff is accompanied by her deaf fiancé, and NFRMC notes in the records the mother and father are deaf.

50.    Due to the ongoing problems with VRI, Plaintiff and her deaf fiancé requested an onsite interpreter. NFRMC used VRI, but once again the VRI was not working, and it would freeze and stop in the middle of the conversation.

51.    Ms. Randall was reduced to communicating by text messages on her cell phone and writing. This was frustrating because she was trying to tend to the two children, and she had brought them in a few days earlier and was worried something was missed. The failure to provide an onsite interpreter, or an auxiliary aid that was effective, shut out Ms. Randall and her deaf fiancé from the communication about the children's health.

52.    No interpreter is provided for the discharge of the three patients.

53.    Ninth Visit to NFRMC: On February 13, 2019, Ms. Randall was treated at NFRMC for left shoulder injury and pain. On information and belief, she

was accompanied by her deaf fiancé, her mother, and her two minor children. Upon arrival, the family requested an onsite interpreter, Again, VRI was provided.

54.     The VRI worked for a very short period of time, but then began to freeze, and became choppy and blurry. Ms. Randall was frustrated because each time she seeks treatment the VRI never works, and she must endure the stopping and starting of the VRI to speak to her doctor. This time, like other times, the device is only used for a brief period of time. Due to the problems, the VRI is then abandoned.

55.     As in other times, she is forced to write either with paper or by typing into her cell phone, but this time she had an injury with her shoulder. It was difficult to write. Ms. Randall underwent x-rays and other examinations, but is unable to engage in her medical care. Ms. Randall's' deaf fiancé is also shut out of the communication.

56.     Tenth Visit to NFRMC: On April 10, 2019, Ms. Randall took A.W. to Emergency Room for vomiting. NFRMC notes in the medical records Ms. Randall is deaf. On information and belief, Ms. Randall was accompanied by her mother.

57.     When Ms. Randall arrived, she requested an onsite interpreter due to the ongoing problems with the VRI. Ms. Randall is more assertive this visit because she is tired of being left out of the discussion about her, and her children's' medical care. NFRMC notes in the medical records, Ms. Randall

requested an interpreter during triage, the Charge Nurse was made aware, and the request was elevated to the House-Supervisor. Ms. Randall tries to explain, by typing on her phone, the long history of the VRI not working.

58.     A.W. vomited again at the Emergency Room, and Ms. Randall wanted to have her questions answered about her child's condition. However, Ms. Randall was required to use the VRI which was freezing and pixilated. Ms. Randall was unable to understand and consent to her child's care. An onsite interpreter was never provided. No interpreter is provided during the discharge.

59.     Eleventh Visit to NFRMC: On August 23, 2019, Ms. Randall returned to NFRMC's Emergency Room with pelvic pain. She was accompanied by her deaf fiancé and the two children.

60.     Ms. Randall and her deaf fiancé requested an onsite interpreter. Due to the ongoing issue with the tubal ligation, she was hoping the hospital could surgically intervene in some way to help with this painful medical issue.

61.     Although Ms. Randall has reported the long history of the VRI not working to the house supervisor in a recent visit to NFRMC, once again NFRMC uses VRI.

62.     The VRI did not work effectively because the transmission was choppy and the screen would black out, making the device ineffective. The VRI was not used throughout her treatment to include at discharge.

63.   Twelfth Visit to NFRMC: In January 2020, Ms. Randall's deaf fiancé was brought to the hospital due to a fall. This was during COVID-19 and everyone was wearing masks, which made it impossible for Ms. Randall to communicate.

64.   Ms. Randall and her fiancé asked for an onsite interpreter so she could understand and help her fiancé. Ms. Randall also gave NFRMC a business card for an interpreter referral service so they could call and secure an onsite interpreter.

65.   Ms. Randall called her deaf/blind friend to come help advocate for her and her fiancé.

66.   NFRMC brought in the VRI device, and it did not work. NFRMC abandon the device, and as is their common practice kept trying to communicate with Ms. Randall and her fiancé by writing. Ms. Randall's fiancé could not understand what was being said, and neither could Ms. Randall. They repeated their request for an onsite interpreter. NFRMC said they would provide an interpreter, but then later told Ms. Randall they could not secure one.

67.   The VRI screen provided by NFRMC was small and was directed at Ms. Randall's fiancé. When the picture was clear, Ms. Randall could not see the screen. Ms. Randall had to try to repositioning herself to see the VRI screen, but she was in the way of the medical staff. The VRI was freezing and pixilating.

68.   Once Ms. Randall's friend arrived, there were now three (3) deaf people in the room, one who is legally blind and cannot see a VRI screen. NFRMC

refused to provide an onsite interpreter, or a VRI that operated. The medical staff kept trying to talk and or write with Ms. Randall and her fiancé, but it was not effective.

69.     The doctor became agitated waiting for the VRI device to work. Eventually, another VRI was brought into the room. After more delay of waiting for the VRI to be set up and logged into, once turned on it did not work. NFRMC abandoned the device and the doctor kept trying to "talk" to Ms. Randall and her deaf fiancé, but they could not understand the medical care.

70.     Ms. Randall, her deaf fiancé, and friend were very frustrated with all the time wasted by NFRMC on the VRI device instead of calling an onsite interpreter and treating her fiancé who was lying in pain.

71.     After leaving the hospital the Interpreter Referral Service, whose name was on the business card provided to NFRMC, was called and asked if the NFRMC called looking for an interpreter. The agency reported the hospital never called.

72.     Thirteenth Visit to NFRMC. On July 2, 2020, Ms. Randall took A.R.W. to the Emergency Room for a bad stomach ache.

73.     Ms. Randall asked her friend, who is deaf and legally blind, to come with her to educate NFRMC about her rights to an auxiliary aid which is effective.

Ms. Randall also hoped her friend could help her understand what was being said if NFRMC only provides the non-operating VRI system.

74.     Due to COVID-19 everyone Ms. Randall came into contact was wearing a mask. This made communication even more difficult.

75.     Upon arrival, Ms. Randall and her friend requested an onsite interpreter. Due to the fact her friend is legally blind, she cannot use VRI because she cannot see the screen.

76.     NFRMC brought out the VRI equipment. Ms. Randall's friend wrote on paper, in large letters due to her vision loss, the need for an onsite interpreter and explained she was blind.

77.     On information and belief, the written conversations between Ms. Randall's friend and NFRMC staff included three separate staff members: a nurse, a doctor, and a third employee believed to be a doctor or an ARNP.

78.     NFRMC said they would provide an onsite interpreter, but they never did.

79.     NFRMC then tried to use the VRI machine, but Ms. Randall's friend could not see the screen, and the image was frozen and kept pixilating.

80.     The nurse asked if Ms. Randall if she could interpret for her deaf/blind friend. Communication had completely broken down, and the hospital

was asking the deaf patient to act as their own interpreter and as an interpreter for her friend.

81.     Fourteenth Visit to NFRMC: On September 11, 2020, Ms. Randall was experiencing COVID symptoms, and went with her brother, Joseph Randall, to the Emergency Room to be tested for COVID-19.

82.     Joseph Randall immediately asked for an interpreter for his sister, telling NFRMC she was deaf and used ASL. NFRMC failed to provide an onsite or VRI interpreter.

83.     Joseph Randall is not a qualified interpreter, and can barely sign. He tried his best to help his sister understand, because NFRMC refused to provide an interpreter.

84.     Ms. Randall tested positive for COVID-19. No interpreter was provided to explain the test results, the potential progression of the virus, the quarantine requirements, or any other COVID-19 related health information. Instead, a staff member came out, wearing a mask, and told her brother Ms. Randall tested positive, and they can leave. The communication was completely ineffective.

85.     NFRMC has engaged in a pattern and practice of discrimination by continuing to use an auxiliary aid that does not provide effective communication,

and deprives Plaintiff of her right to an interactive exchange of medical information.

86.    On information and belief, there are at least six (6) ASL Interpreter Referral agencies serving the Gainesville area that can provide interpreters, seven days per week, 24 hours per day.

87.    Although not required to by law, Ms. Randall made an attempt to rectify these issues prior to filing her Complaint.

88.    Ms. Randall shall continue future use of NFRMC as it is a hospital covered by her health insurance, and close to her home.

89.    The Plaintiff experienced humiliation, dejection, embarrassment, anger, frustration, and fear as the direct result of Defendant's violation of her federally protected rights.

90.    Defendant's actions have caused the Plaintiff distinct, palpable, and perceptible injury. Those injuries include, but are not limited to, those described herein.

## Count I

## Title III of the Americans with Disabilities Act

91.    Plaintiff repeats and re-alleges allegations ¶¶ 1-90 in support of her claims.

92.     Plaintiff, in this Count, requests declaratory and injunctive relief pursuant to Title III of the ADA.

93.     Defendant is an entity covered by Title III of the ADA, 42 U.S.C. § 12101, *et seq,* and places of public accommodation, as defined by Title III of the ADA, 42 U.S.C. § 12181(7), 28 C.F.R. § 36.104.

94.     Defendant's actions and omissions violate their duty to ensure that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182.

95.     Defendant failed to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. 42 U.S.C. §§ 12182 (b) (2) (A) (ii).

96.     Defendant failed to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of <u>auxiliary aids</u> <u>and services,</u> unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the goods, services, facility, privilege, advantage,

or accommodation being offered or would result in an undue burden. 42 U.S.C. § 12182 (b) (2) (A) (iii) (emphasis added).

97.     The term "auxiliary aids and services" includes: "Qualified interpreters on-site or through video remote interpreting (VRI) services, notetakers; real-time computer-aided transcription services; written materials; exchange of written notes…accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." 28 C.F.R. § 36.303 (b) (1). (emphasis added).

98.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F. R. § 36.303 (c) (1) (ii).

99.     A qualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. 28 C.F.R. § 36.104.

100.    A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her. 28 C.F.R. § 36.303 (c) (2).

101.   A public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities. This includes an obligation to provide effective communication to companions who are individuals with disabilities. 28 C.F.R. § 36.303 (c) (1).

102.   A public accommodation that chooses to provide qualified interpreters via Video Remote Interpreting [VRI] service shall ensure that it provides— (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video **images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication**; (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI. 28 C.F.R. § 36.303(f)(emphasis added).

103. Defendant has engaged in an ongoing pattern and practice of discrimination by continually providing VRI equipment which violates the regulations.

104.   As a result of Defendant's actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities. In engaging in this unlawful conduct described above, Defendant acted maliciously to damage the rights and dignity of Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below.

## COUNT II

## SECTION 504 OF THE REHABILITATION OF 1973

105.   Plaintiff incorporates and re-alleges paragraphs ¶¶ 1-90 in support of her claims.

106.   Plaintiff in this Count requests declaratory relief, permanent injunctive relief, and monetary damages pursuant to Section 504.

107.   Ms. Randall is deaf, and her disabilities substantially limit major life activities and she is, therefore, considered to be an individual with a disability under Section 504.

108.   Count II is brought against the Defendant as a claim for discrimination against people with disabilities in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, which provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705 (20) of this title, shall, solely

by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

109.   Defendant is a recipient of federal financial assistance including, but not limited to, acceptance of Medicare and Medicaid funds, and are, therefore, subject to the requirements of Section 504. 29 U.S.C. § 794.

110.   Defendant has intentionally discriminated against Plaintiff on the basis of her disabilities, in violation of 29 U.S.C.§ 794 and its implementing regulations. Such discrimination includes, but is not limited to, failure to provide auxiliary aids and services, denial of effective communication, and exclusion to services based on disability. 45 C.F.R § 84.52.

111.   A recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care. 45 C.F.R. § 84.52 (c).

112.   Defendant's actions were intentional and with reckless disregard for the rights of the Plaintiff who made repeated affirmative requests to be accommodated, as did her companions.

113.   As a result of Defendant's actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.

114.   Defendant has engaged in an ongoing pattern and practice of discrimination by continually violating Ms. Randall's federally protected rights.

115.   In engaging in this unlawful conduct described above, Defendant acted intentionally and maliciously to damage the rights and dignity of the Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below.

## COUNT III

## SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

116.   Plaintiff incorporates and re-alleges paragraphs ¶¶ 1-90 as it fully set forth herein.

117.   Plaintiff, Ms. Randall, is substantially limited in the major life activities of hearing and speaking. Accordingly, she is an individual with a disability as defined under 29 U.S.C. § 705(20) and 42 U.S.C. § 12102.[1] *See* 42 U.S.C. § 18116; 45 C.F.R. § 92.4.

118.   Defendant is a "healthcare program or activity," receiving federal financial assistance, including Medicaid and Medicare reimbursements. They are, therefore, a covered entity under 42 U.S.C. § 18116.

---

[1] With the exception of its federal funding requirement, Section 504 uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable. *Badillo v. Thorpe*, 158 Fed. Appx. 208, 214 (11th Cir. 2005) (citing *Cash v. Smith,* 231 F.3d 1301, 1305 & n. 2 (11th Cir. 2000)).

119.   Section 1557 of the Patient Protection and Affordable Care Act states "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]". 42 U.S.C. § 18116(a).

120.   A public entity shall give "primary consideration" to the requested accommodation by individuals with disabilities. 45 C.F.R. § 92.202. S*ee* 28 C.F.R § 35.160 (b) (1) (2).

121.   A qualified interpreter for an individual with a disability means an interpreter who via a remote interpreting service or an on-site appearance: (i) Adheres to generally accepted interpreter ethics principles, including client confidentiality; and (ii) is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, terminology and phraseology. 45 C.F.R. § 92.102.

122.   Defendant has engaged in an ongoing pattern and practice of discrimination by continually violating Ms. Randall's federally protected rights.

123.   Defendant has intentionally discriminated against the Plaintiff solely on the basis of her disability, in violation of Section 1557 the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

124.   As a result of Defendant's actions described above, Plaintiff suffered irreparable loss and injury including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disability. In engaging in this unlawful conduct Defendant acted intentionally and maliciously to damage the rights and dignity of the Plaintiff.

**WHEREFORE,** Plaintiff requests the relief set forth below.

## <u>Relief Requested</u>

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A.   The Court assume jurisdiction;

B.   Issue a declaratory judgment that Defendant's policies, procedures, and practices have subjected Plaintiff to discrimination in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Affordable Care Act;

C.   Enjoin Defendant from any policy, procedure, or practice that will deny deaf individuals, such as the Plaintiff, equal access to an equal opportunity to participate in and benefit from Defendant's services, or that denies Plaintiff effective communication with Defendant;

D.   Order Defendant to train its employees about Plaintiff's rights, and the rights of individuals who are deaf, about the requirements to provide

auxiliary aids and services, including providing qualified sign language interpreters;

E.     Award compensatory damages to the Plaintiff for violation of Section 504 and the Affordable Care Act;

F.     Award reasonable attorney's fees, and expenses and costs of suit; and

G.     Grant such other relief as the Court may deem equitable and just under the circumstances.

DATE: April 14, 2021.

Respectfully submitted,

MORGAN AND MORGAN

*/s/ Sharon Caserta*
Sharon Caserta, Esq.
Florida Bar No.: 0023117
Morgan & Morgan
Deaf /Disability Rights
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 245-1121 (Videophone)
(904) 361-0078 (Voice)
(904) 361-4305 (Facsimile)
scaserta@forthepeople.com
*Counsel for Plaintiff*